IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| VANESSA FEN-JUNG LIU,<br><br>     Plaintiff,<br><br>v.<br><br>SALT LAKE COMMUNITY COLLEGE, and<br>RICHARD A. DIAZ,<br><br>     Defendants. | MEMORANDUM DECISION AND<br>ORDER GRANTING [57] DEFENDANTS'<br>MOTION FOR SUMMARY JUDGMENT<br><br>Case No. 2:21-cv-00608-CMR<br><br>Magistrate Judge Cecilia M. Romero |

All parties in this case have consented to the undersigned conducting all proceedings, including entry of final judgment (ECF 12). *See* 28 U.S.C. § 636(c); *see also* Fed. R. Civ. P. 73. Before the court is Defendants Salt Lake Community College (SLCC) and Richard Diaz' (Diaz) (collectively, Defendants) Motion for Summary Judgment (Motion) (ECF 57). The court also considered Plaintiff Vanessa Fen-Jung Liu's (Plaintiff) Response (ECF 64) and Defendants' Reply (ECF 65). On January 16, 2025, the court heard oral argument on the Motion (ECF 67). Having carefully considered the relevant filings, case law, and oral argument, the court GRANTS Defendants' Motion for the reasons set forth below.

## I.  PROCEDURAL BACKGROUND

Plaintiff initiated this matter on October 15, 2021, by filing a complaint against SLCC and Diaz, asserting claims under 42 U.S.C. § 1983 (1983 Complaint) (ECF 2). In the 1983 Complaint, Plaintiff asserts one cause of action against Defendants alleging that they discriminated against her "when they rejected Plaintiff for promotions based on her race" (*id.* at 5). On February 21, 2023, Plaintiff filed a separate complaint against only SLCC, asserting claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 (Title VII Complaint); *see Liu v. Salt Lake*

1

*Community College*, Case No. 2:23-cv-00129. The Title VII Complaint asserts three causes of action: (1) employment discrimination due to race; (2) employment discrimination due to national origin; and (3) unlawful retaliation (Title VII Complaint at 13–16). The parties do not dispute that Plaintiff, who was born in Taiwan and is of Asian descent, belongs to a protect class (1983 Complaint at 3; Title VII Complaint at 13). In August 2023, upon stipulation of the parties, the court entered an order, consolidating the two matters (ECF 50).

In April 2022, Defendants filed a motion for partial judgment on the pleadings regarding the 1983 Complaint, seeking dismissal of Plaintiff's § 1983 claim against SLCC and Diaz, in his official capacity, arguing that neither defendant is a "person" under § 1983 (ECF 31 at 1). The court granted Defendants' motion, dismissing Plaintiff's § 1983 claim against SLCC and Diaz in his official capacity (ECF 42 at 6). Consequently, the only remaining claims from the 1983 Complaint are against Diaz in his personal capacity.[1]

## II.    FACTUAL BACKGROUND

Plaintiff began working for SLCC in or around 2009 (ECF 2 at 3). Diaz has been Plaintiff's supervisor at all relevant times (*id.* at 4). On September 7, 2019, Diaz informed Plaintiff, and other employees, that he would be conducting an internal search to promote two employees to "Manger 1" positions (ECF 57-4 at 2). Diaz then sent an email asking interested employees to submit a resume and letter of interest by October 2, and informing applicants that interviews would start on October 4 and finish the week of October 7 (ECF 57-3 at 15). A total of four employees applied for the promotions, including Plaintiff who applied for both manager positions (*id.*).

---

[1] The court notes that "[s]ection 1983 plaintiffs may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive relief," *Brown v. Montoya*, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011), therefore Plaintiff's suit against Diaz under § 1983 is limited to money damages.

Thereafter, Diaz formed a search committee to help decide who would receive the two promotions (*id.* at 18). Throughout this litigation, Plaintiff has maintained that Diaz' authority and responsibilities for filling these two available positions is governed by SLCC's Job Evaluation Policy (ECF 64 at 22–23). The particular section of the policy Plaintiff relies on states: "Supervisors are responsible for keeping all positions appropriately evaluated which they directly supervise" (*id.*; ECF 64-1 at 5). While the Job Evaluation Policy does not state that managers need to use a search committee when filling internal promotions, it likewise does not state managers cannot use a search committee (ECF 64-1 at 3–13).

When it came to the evaluations, the search committee gave each applicant one hour for the interview and as part of that interview each applicant gave a fifteen-minute presentation that they had been asked to prepare in advance (ECF 57-3 at 22). In deciding whom to select for the positions, Diaz indicated that the search committee looked at the employee's work history, the quality of their work, the strength of their answers in the interview, and the quality of their presentation (*id.* at 21).

After the interviews, Diaz and the search committee were unanimous in who they wanted to hire for the two positions: Alex Czaja (Czaja), and Erin Stirling (Stirling) (ECF 57-3 at 21). Diaz then submitted the recommendations to his supervisor as well as human resources, and those recommendations were approved (*id.* at 24). Diaz later testified that the two applicants were chosen because of the way they answered the questions in the interview, the strength of their presentations, their confidence, and their vision for the office (*id.* at 23).

On October 13, 2019, Diaz sent an email to Plaintiff informing her that she had not been selected for promotion (ECF 57-7).[2] The next day, Diaz provided Plaintiff with the following feedback from the search committee regarding her interview:

- Think of ways you can point out the improvements needed in the office without tearing down the work of others. This may not have been your intention, but that's how it came through in your interview.
- Some of the answers you are trying to deliver gets lost in your responses, specially with the stories you choose to share. I think they take a long time to get to the point or to tie back to the question. Practice more ways to be succinct.
- Your presentation was more of a "show and tell" spending a lot of time discussing the website rather than showcasing your understanding of how you leading FYE can help the College make progress in the strategic plan.
- Try using a single medium to present, you went back and forth between slides and the website. Which at times confused you and us and took time away from you.
- Presentation needed more framing. What we were looking for came at the very end, after a long introduction. And you didn't have enough time to go in-depth. Also starting the presentation by saying you didn't have time to prepare was not the best way to start. All the other applicants had the same time you did to put something together, and having more confidence in your work would have given us more confidence.
- Try sharing more personal experiences of the work you have done in the office and how you have improved it over time rather than criticism of others' work.
- You could have made your point without needing to play the videos on the website which only added to the limited time you had to showcase your talent and skills. Overall, you didn't manage your interview time very well. Practice being more time conscious and reducing the number of tangents you incorporate in your responses.
- You need to work more on connecting your examples to the question. For example, when you spoke about your degrees you did a great job explaining what they focus on, but not discussing what qualities they gave you and how those will help you lead. When you talk about how you treat everyone as individuals, you use the example of your kids. [Diaz] had to prompt you to think of another example that was more work related.
- The bulk if not all of your examples were from experiences or jobs outside of FYE. Why not use your most recent experience in the department to answer the

---

[2] Plaintiff asserts that Diaz only informed her that she was not selected "for this position" rather than "for either position," stating that "Diaz has never acknowledged Plaintiff had applied for both positions and that he had passed over her twice" (ECF 64 at 7–8). But Plaintiff has provided no record cites that would suggest there was ever any confusion between the parties about the positions Plaintiff was applying for nor was there anything to suggest that Plaintiff herself was confused as to whether she was granted or denied either of the promotions. In any event, Plaintiff has also not made clear what relevance her additions on this point have to the issues at hand.

questions. You've been in the office for six years, why not showcase your work in the department through your responses.
- You answered the question about supervision using an example of when you were a club advisor. Being an advisor for a club and supervising people can be similar but take different skills. A better example could have come from the student leaders and specialist you supervise in the office and what your approach is when working with them.
- You said you are not too familiar or don't remember the best practices and literature guiding orientation and retention programs, but if you were to get the job you will research them. I believe these are things you should be doing now as a coordinator to prepare to move up in this filed and should be part of your professional development plan.
- Explore more ways in which you can broaden your practices to serve our diverse students. Besides patience, you said you've always worked with diverse students so you haven't really changed your practices, but the needs of our diverse students are always changing. For example, using pronouns to be more inclusive of our LGBTQ+ students is a way in which I've changed my practices. Another example could be adopting universal access design principles in my presentations so I can be more inclusive of students with disabilities.

(ECF 57-7 at 2–3). According to Plaintiff, the feedback she received from the search committee was all pretextual (ECF 2 at 5). In Plaintiff's view, Diaz only formed the search committee so that he could promote the two white candidates—Stirling and Czaja—over Plaintiff and the other candidate who is also Asian (ECF 64 at 6).

After the promotions had been awarded, Stirling became Plaintiff's direct supervisor (ECF 57-11 at 7). Stirling later testified that, between 2019 and 2020, she communicated with Plaintiff on various occasions about her performance issues, such as Plaintiff's unwillingness to do projects and not completing assignments in a timely manner (*id.* at 8). In support of this timeline of events, Stirling provided her personal notes regarding conversations she had in February 2020 with Plaintiff (ECF 57-12). Additionally, Stirling provided a declaration indicating that she wrote the aforementioned notes on February 19, 2020, and February 26, 2020 (ECF 65-2). Stirling also testified about other entries that she made in her notes between April 2021 and November 2021 related to Plaintiff's performance issues (ECF 57-11 at 11).

In April 2021, Plaintiff indicated that she would like to submit a request under SLCC's Staff Development Leave (SDL) (ECF 64-2 at 59). SLCC's policy on SDL states in relevant part that "[t]he college provides opportunities for members of the Staff Association to apply for staff development leave to continue their pursuit of continuing educational and/or professional opportunities that are not currently provided by the institution" (ECF 57-17 at 2). The policy further provides that "[c]onsiderations used in reviewing the applications and selecting individuals for staff development leave" include "any previous staff development leaves granted" (*id.* at 3). When Plaintiff made this request in April 2021, she had already previously submitted, and been granted, an SDL request in August of 2016 which allowed her to take a year off from work in pursuit of a PhD (ECF 64-2 at 11–13).

Stirling was supportive of Plaintiff's second SDL request and wrote a letter to that effect (ECF 64-4). Specifically, Stirling wrote that she "recognize[d] the value" that Plaintiff's completion of her PhD will add to their department (*id.* at 2). Later, Stirling testified that she wrote the letter because she "figured life would be easier for a year" and she would be able to "grow the program while [Plaintiff] was gone" (ECF 57-11 at 8).

On or about May 14, 2021, Stirling informed Plaintiff that her SDL request had been denied and that, if she had any questions or concerns, Plaintiff could discuss the matter further with Diaz (Title VII Complaint at 7). A few days later, Plaintiff spoke with Diaz about her request being denied and Diaz purportedly told Plaintiff that she had already received an SDL, and he conveyed his belief that the SDL policy did not support a second leave (*id.*). Also in May 2021, Stirling's personal notes recounted concerns she was having with the accurateness and timely completion of one of Plaintiff's assignments and she was further concerned about Plaintiff's absence during an orientation event (ECF 65-1 at 2). Furthermore, Stirling's notes indicate that Plaintiff had missed

several meetings due to illness but that, for some of the meetings that Plaintiff did attend, Plaintiff was either late or, during virtual meetings, appeared inattentive (*id.*).

In June 2021, Plaintiff met with Diaz' supervisor, Kathryn Coquemont (Coquemont), about her SDL request (ECF 64-2 at 23; ECF 57-20 at 3). Diaz testified that Coquemont later told him about this June 2021 meeting (ECF 57-3 at 37). Coquemont apparently told Diaz, that when it seemed like Plaintiff was failing to convince Coquemont that Plaintiff should be able to go on leave, Plaintiff "switched strategies" and began saying that Diaz had insulted Coquemont in front of others (*id.*). Moreover, during this conversation, Plaintiff ostensibly told Coquemont that Diaz had "used the 'B' word" to describe her and was "out to get [Coquemont's] job" (*id.*).[3] Upon hearing Coquemont's account of her meeting with Plaintiff, Diaz asked Coquemont for advice (*id.*). Diaz stated that Coquemont told him to write Plaintiff up for insubordination (*id.*).

On July 1, 2021, Plaintiff received an email from Coquemont indicating that she stood by Diaz' position to deny Plaintiff's requested SDL (ECF 57-2 at 13). The following week, on July 8, Plaintiff contacted an individual in the human resources department (HR) to schedule a meeting to discuss her "concerns regarding lack of fairness in the denial of [her] application" for SDL by Diaz and Coquemont (ECF 64-5 at 2). Six days after Plaintiff scheduled a meeting with HR, on July 14, Diaz sent an email to Chuck Lepper (Lepper), the Vice President for Student Affairs & Enrollment Management, regarding Plaintiff's SDL request and other related matters (ECF 57-8). Diaz told Lepper that he thought the department policy did not allow for one employee to take two

---

[3] While the court notes potential hearsay issues with Diaz' testimony about what Plaintiff reportedly told Coquemont, Plaintiff does not dispute that this conversation took place as described by Diaz. Instead, Plaintiff argues that it was her responsibility to report this conduct, and she felt "obligated to report to Coquemont, Diaz' supervisor, under the unethical conduct policy, that Diaz had use the B-word in reference to Coquemont" (ECF 64 at 16). Since Plaintiff herself apparently testified that the conversation took place as Diaz describes, no objection to the admissibility of said evidence has been raised, and the content and truth of what was said is not material to the issues here, only that the conversation took place on the said date regarding the affirmance of the denial of the SDL, the court does not find it necessary to engage in an analysis of whether Diaz' testimony on this point contains inadmissible hearsay.

SDL's and that he felt that having Plaintiff gone for a year would slow down the department (*id.* at 3). Furthermore, Diaz conveyed his belief that another employee was seeking SDL for the same time period, and he did not think it would be good for the department to have two employees gone at the same time (*id.*). In that same email, Diaz also stated that Plaintiff had "missed a couple of meetings since all this happened and her performance has gone down" and he "can tell [Plaintiff] is not happy with us" but that "[Stirling] is working with HR to prepare a memo of expectations using the examples she has recorded" (*id.* at 4).

Also in July 2021, Stirling spoke with an HR representative about how to handle the problems she was having with Plaintiff's performance (ECF 57-11 at 15). Stirling testified that before she spoke with HR, she did not know anything about Plaintiff's meeting with HR, which also took place that same month (*id.*). On July 20, Stirling sent Plaintiff an email detailing some concerns she had related to Plaintiff's performance (ECF 57-14).

On July 21, 2021, Plaintiff finally met with an HR representative (ECF 64-2 at 66). At this meeting, Plaintiff detailed her concerns about the reasons that she believed her SDL request had been denied (*id.*). Among those reasons, Plaintiff indicated that she believed she was being discriminated against because of her race (*id.* at 69).[4]

---

[4] In addition to reporting this alleged discrimination to HR, there are potentially two additional acts of protected activity that Plaintiff engaged in that the court does not consider in deciding the Motion because those acts were not mentioned in Plaintiff's opposition to the Motion and Plaintiff provided no citations to the record demonstrating that either of these acts took place. The first is from the Title VII Complaint, where Plaintiff states that she also engaged in protected activity on July 27, 2021, when she met with individuals from the college's Equal Employment Opportunity Office and "reported the details of Diaz's unfair treatment and discrimination against Plaintiff" (Title VII Complaint at 10). In response to the Motion, Plaintiff makes no mention of this meeting, and there are no citations to the record indicating that this meeting took place. The second act is mentioned in one of Plaintiff's exhibits, where she references a report regarding Diaz' "unethical conduct" that she apparently made on September 13, 2021 (ECF 64-10). This September 13 report is not even mentioned in the Title VII Complaint and there is no indication in the record as to what was contained in this report or who Plaintiff may have sent it to.

On October 11, 2021, Diaz emailed Plaintiff stating that he wanted to meet with her about the comments Plaintiff had made to Coquemont (ECF 57-15). Diaz stated that the comments were "highly inappropriate" and "highly unprofessional" (*id.* at 2).

On October 15, four days later, Stirling issued a memorandum of understanding (MOU) to Plaintiff regarding her failure to adequately utilize SLCC's MySuccess program, (ECF 57-9), which Stirling explained is a "case-management program used throughout [SLCC]" (ECF 57-11 at 10). The memorandum stated it was "not a formal corrective action" and it would not be placed in Plaintiff's official personnel file (ECF 57-9 at 2). Shortly thereafter, Stirling issued a memorandum of understanding to another employee—Nancy Giraldo (Giraldo)—which also related to Giraldo's failure to utilize the MySuccess program (ECF 57-19). Similar to the MOU received by Plaintiff, this MOU indicated it was not a formal corrective action, nor would it be placed in Giraldo's official personnel file (*id.* at 2). On October 21, 2021, Stirling then issued Plaintiff a memorandum of expectations (MOE) to "clarify job expectations" with Plaintiff and "correct" previous setbacks (ECF 57-10 at 2). The MOE stated that it was intended to help Plaintiff be "aware" of her supervisor's concerns "with the aim of remediating those as quickly as possible" (*id.* at 3).

According to Plaintiff, the email she received from Diaz about her "inappropriate" and "unprofessional" comments, along with the MOU and MOE issued by Stirling, demonstrate an increased pattern of retaliation against Plaintiff for the protected activity that she had engaged in when she reported Diaz' alleged discriminatory conduct to HR (*see* ECF 67).

Defendants now move for summary judgment on all of Plaintiff's remaining claims, in both the 1983 Complaint and the Title VII Complaint (ECF 57).

### III.    LEGAL STANDARDS

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, courts "examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." *Barber ex rel. Barber v. Colorado Dept. of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009) (quoting *T-Mobile Cent., LLC v. Unified Gov't of Wyandotte Cnty.*, 546 F.3d 1299, 1306 (10th Cir. 2008)). "For there to be a 'genuine' dispute of fact, there must be more than a mere scintilla of evidence; to avoid summary judgment, the evidence must be such that a reasonable jury could return a verdict for the nonmoving party." *Aubrey v. Koppes*, 975 F.3d 995, 1004 (10th Cir. 2020) (quoting *Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*, 960 F.3d 1255, 1259 (10th Cir. 2020)). Thus, a "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Barber*, 562 F.3d at 1228 (quoting *Bruner v. Baker*, 506 F.3d 1021, 1025 (10th Cir. 2007)). Furthermore, "mere conclusory allegations are insufficient to establish an issue of fact under Fed. R. Civ. P. 56." *Barber*, 562 F.3d at 1228.

### IV.    DISCUSSION

#### A.    <u>Evidentiary Objections</u>

The court first addresses the evidentiary objections raised by Defendants in their reply memorandum along with several of the facts that Plaintiff has labeled in her response to the Motion as either "disputed" or "disputed, in part." When considering a motion for summary judgment, "'[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury' in some form." *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006) (quoting *Argo v. Blue Cross & Blue Shield*

*of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir.2006)). "The requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form." *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (quoting 11 James Wm. Moore et al., *Moore's Federal Practice–Civil* § 56.91 (3d ed. 2015)). Moreover, under Rule 56(c), a party asserting that a fact is disputed must support their position by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Thus, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact" then "the court may . . . consider the fact undisputed for purposes of the motion[.]" *Id.* R. 56(e). To that end, for the nonmoving party to satisfy their summary judgment burden they "must point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on speculation, conjecture, or subjective belief are insufficient." *Grays v. Navient Sols., LLC*, No. 20-cv-00452-NYW-SKC, 2023 WL 2826287, at *1 (D. Colo. Mar. 10, 2023) (citing *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)).

    Defendants object to Exhibit 7, attached to Plaintiff's response to the Motion, which contains Plaintiff's "Response to Diaz' Denial of Application for a SDL" (ECF 64-1 at 1). The reason Defendants object to this exhibit is that it "was not disclosed to the Defendants as part of Plaintiff's Initial Disclosures or during discovery" (ECF 65 at 3). The Federal Rules of Civil Procedure dictate that this is reason enough to discount this evidence in ruling on the Motion.

    Under the Federal Rules of Civil Procedure where "a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was

substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Since Plaintiff has not demonstrated that Exhibit 7 was disclosed to Defendants in accordance with Rule 26, and the failure to do so has not been shown to be substantially justified or harmless, the court will not consider said exhibit in ruling on the Motion.[5]

Next, the court turns to the portions of Plaintiff's response to the Motion, where she has asserted that certain facts are "disputed" or "disputed, in part" (ECF 64 at 3–22). For example, Defendants stated that "[i]n deciding whom to select for the [promotion] positions, Diaz and the search committee looked at work history [of the applicants], the quality of their work, the strength of their answers in the interview, and the quality of their presentation" (ECF 57 at 9). In response, Plaintiff asserted that this fact is "[d]isputed, in part" (ECF 64 at 6). According to Plaintiff, Diaz and the search committee used the interviews "as a pretext to discriminate against" Plaintiff and the other Asian applicant (*id.*). In support of this position, Plaintiff cites only to her deposition testimony (*id.*). However, Plaintiff's subjective belief that Defendants denied her a promotion based on pretext does not create a dispute as to whether Diaz and the search committee looked at a certain set of criteria in deciding whom to promote. As previously noted, "conclusory statements based on speculation, conjecture, or subjective belief are insufficient" to create a genuine dispute of material fact. *See Grays*, 2023 WL 2826287, at *1. The court therefore does not consider there to be a genuine dispute as to the general criteria that Diaz and the search committee looked to in deciding the promotions.

Another example on this point comes from Plaintiff's dispute of Defendants' assertion that "[o]n February 26, 2020, Stirling had a conversation with Plaintiff regarding how Plaintiff had not

---

[5] While Plaintiff did not dispute Defendants' assertion that this exhibit was never disclosed during discovery, the court also notes that Plaintiff does not appear to rely on or cite to Exhibit 7 at any point in her response to the Motion (*see* ECF 64). The relevance of said exhibit to Plaintiff's opposition to the Motion is therefore unclear.

completed her Growth Planning and Support ('GPS') report despite being reminded several times to do so" (ECF 64 at 13–14). Plaintiff disputes this fact stating that "[i]f Stirling's claim in her deposition regarding the reason she produced her letter of support to Plaintiff's applying for a SDL (that is, to get Plaintiff out of her life by dispatching her to China for a year), . . . is true, then Stirling intentionally deceived her supervisors and the College" (*id.* at 14). In support of her position, Plaintiff does not cite to any fact in the record which would dispute Defendants' statement regarding the February 26 conversation Stirling had with Plaintiff. While the exact basis of Plaintiff's opposition is not entirely clear, it appears that she disputes this fact on the basis that it creates a problem with Stirling's "credibility" (*id.*). Plaintiff maintains that around the same time that Stirling was documenting Plaintiff's performance issues, she had also written her letter in support of Plaintiff's SDL request (*id.*). In Plaintiff's view, Stirling would not have written the letter in support of Plaintiff's SDL request if she was also having issues with Plaintiff's job performance at the time. This argument fails to demonstrate that there is a genuine issue of fact related to Stirling's account of the February 26 conversation for several reasons.

Beginning with the content of Stirling's letter in support of the SDL request, the court notes that nothing in Stirling's letter speaks to her observations regarding Plaintiff's work performance (ECF 64-4 at 2). The letter only conveys Stirling's belief that Plaintiff's completion of her PhD would be valuable to the department, and that they could make do for a year while Plaintiff was away (*id.*). Plaintiff has provided no citations to the record that would suggest that an employee with a poor work performance is barred from submitting an SDL request or that their direct supervisor is required to oppose such a request on that basis. There is therefore no support for Plaintiff's position that Stirling's account of the February 2020 conversation is inconsistent with her statements in the SDL letter. Plaintiff has therefore failed to demonstrate that a "credibility"

13

issue exists on this point as to render a genuine dispute of material fact.[6]

In sum, the other facts that Plaintiff has "disputed" or "dispute, in part" are grounded in arguments akin to the above-referenced examples: either lacking references to record cites or countering Defendants' stated fact with legal argument.[7] Where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact" then "the court may . . . consider the fact undisputed for purposes of the motion," Fed. R. Civ. P. 56(e), and because conclusory statements based on speculation, conjecture, or subjective belief are insufficient to create a genuine dispute of fact, *see Grays*, 2023 WL 2826287, at *1, the court did not consider there to a genuine dispute regarding the facts recounted above, *see supra* Part II.

## B.    1983 Complaint

"The elements of a section 1983 claim are the deprivation of rights secured by the Constitution or federal law, and action occurring under color of state law." *Garcia v. Wilson*, 731 F.2d 640, 651 (10th Cir. 1984). Section 1983 itself however "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Sivulich-Boddy v. Clearfield City*, 365 F. Supp. 2d 1174, 1183 (D. Utah 2005) (quoting *Graham v. Connor*, 490 U.S. 386, 393–94 (1989)).

---

[6] Alternatively, the court finds that Defendants' Exhibit 12 supports their position that Stirling's February 26 conversation with Plaintiff is undisputed. Exhibit 12 includes Stirling's notes from February 19, 2020, and February 26, 2020, detailing conversations Stirling had with Plaintiff regarding her performance issues (ECF 57-12 at 2–4). This exhibit provides direct support for Defendants' statement of fact regarding Stirling's February 26 conversation with Plaintiff. Plaintiff, on the other hand, claims that Stirling's notes in Exhibit 12 are "unreliable" and that there is "no way to confirm the content was authentic" (ECF 64 at 13). In response, Defendants' point to Exhibit 22, which contains Stirling's declaration that Exhibit 12 contains "a true and correct copy of notes" that she took "regarding conversations [she] had with Plaintiff on February 19, 2020, and February 26, 2020" (ECF 65-2 at 2). Plaintiff lodged no objected to Stirling's declaration in Exhibit 22. Because Defendants have provided foundation in support Stirling's notes contained in Exhibit 12, and no objection was raised concerning her declaration, the court finds no basis to find the exhibit inadmissible. Seeing as Plaintiff has not provided any other citations to the record, other than her own testimony that Stirling never had problems with her performance prior to July 2021, the court considers Defendants' fact related to the February 26 conversation undisputed for purposes of the Motion. See Fed. R. Civ. P. 56(e).

[7] This includes Plaintiff's responses to Defendants' Statement of Facts: 6–9, 16–23, 26, 28 and 29 (ECF 64 at 4–18).

In this matter, Plaintiff alleges that Diaz impermissibly denied her a promotion because of her race, which is a violation of 42 U.S.C. § 1983 (ECF 2 at 5). Upon review of the evidence revealed during discovery, Defendants maintain that Plaintiff cannot meet her burden of establishing her § 1983 claim against Diaz, thus her claims should be dismissed, but Defendants also assert that Plaintiff is not entitled to pursue these claims against Diaz because he is entitled to qualified immunity (ECF 57 at 15). Because the court finds that Diaz is protected by qualified immunity, it need not consider the merits of Plaintiff's § 1983 claim any further.

### 1.    Qualified Immunity

When the defense of qualified immunity is raised, "the onus is on the plaintiff to demonstrate '(1) that the official violated a statutory or constitutional right, *and* (2) that the right was clearly established at the time of the challenged conduct.'" *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Calhoun v. Buck*, 371 F. Supp. 3d 1008, 1016 (D. Utah 2019) (quoting *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017)). The Tenth Circuit has also made clear that, to establish a viable claim under § 1983 while simultaneously overcoming an assertion of qualified immunity, a plaintiff "must do more than show that their rights were violated" and the failure to make a more particularized showing in this respect will entitle the defendants to qualified immunity. *A.M. v. Holmes*, 830 F.3d 1123, 1163 (10th Cir. 2016) (quoting *Pahls v. Thomas*, 718 F.3d 1210, 1228 (10th Cir. 2013)).

As stated by the United States Supreme Court, to defeat qualified immunity, the rights alleged to have been violated must be established "in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Reichle v. Howards*, 566 U.S. 658, 665 (2012). In

other words, "[w]hether a right is 'clearly established' is an objective test" and the relevant inquiry "in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (quoting *Stearns v. Clarkson*, 615 F.3d 1278, 1282 (10th Cir. 2010)). Notably, "[i]n order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Brown*, 662 F.3d at 1164 (quoting *Stearns*, 615 F.3d at 1282).

Because a plaintiff must satisfy both parts of the qualified immunity test to proceed with their claims, "[c]ourts have discretion to determine 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Calhoun*, 371 F. Supp. 3d at 1017 (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). While it is not entirely clear from her opposition to the Motion, Plaintiff appears to argue that both prongs are satisfied, thus defeating qualified immunity, because Diaz strayed from the procedures outlined in SLCC's Job Evaluation Policy when he created a search committee to decide which employees would be promoted (ECF 64 at 23). For the following reasons, the court is not persuaded that the undisputed facts demonstrate that Diaz violated the policy in question nor that such a violation, if one had occurred, would be sufficient to overcome qualified immunity.

In response to Defendants' qualified immunity argument, Plaintiff points directly to SLCC's Job Evaluation Policy and asserts that Diaz strayed from the procedures outlined therein when he created a search committee to decide which employees would be promoted (ECF 64 at 23). The policy in question states: "Supervisors are responsible to keep all positions appropriately evaluated which they directly supervise" (ECF 64-1 at 5). Plaintiff reads that policy as requiring a

16

supervisor, such as Diaz, to make all decisions regarding promotions by himself, "without the involvement of third parties" (ECF 64 at 23). Defendants point out however that "Diaz did not delegate his authority to a search committee but rather used a search committee to help with selecting who would be promoted" (ECF 65 at 5). Defendants also argue, with great force, that "[n]othing in the policy prohibits the use of a search committee to assist in determining whom to promote" (*id.*).

In looking at the plain language of SLCC's Job Evaluation Policy, the court agrees with Defendants that nothing prohibited Diaz from using a search committee to fill available positions. In fact, it is not even clear whether the section of the policy referred to by Plaintiff governs the procedures related to internal promotions. Upon being confronted with Defendants' interpretation of the policy, even Plaintiff conceded, during the hearing, that none of the relevant provisions explicitly prevented Diaz from using a search committee (*see* ECF 67). It therefore follows that Diaz did not stray from any of SLCC's procedures related to the promotions. Because Plaintiff in effect agreed that the use of a search committee did not violate any of SLCC's policies or procedures, the court finds that her argument that such a "violation" would defeat qualified immunity is inapplicable to the present situation.

Even if Diaz' use of a search committee was contrary to the Job Evaluation Policy, the court is also unpersuaded by Plaintiff's argument that a deviation from SLCC's policies or procedures was a violation of a clearly established statutory or constitutional right (ECF 64 at 23–28). As previously discussed, the relevant analysis that addresses whether Diaz is entitled to qualified immunity requires Plaintiff to establish that Diaz violated her federal rights and that those rights were *clearly established* at the time. *See Quinn*, 780 F.3d at 1004. The "clearly established" part of the inquiry requires there to be either "a Supreme Court or Tenth Circuit decision on point,

or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Brown*, 662 F.3d at 1164 (quoting *Stearns*, 615 F.3d at 1282). The only response that Plaintiff has to this prong of the test is her position that a "deviation from the established policy and procedure undermines any inference that Diaz acted within the scope of his discretionary authority, thereby disqualifying him from being able to use the shield of qualified immunity" (ECF 64 at 24). Because Plaintiff has not provided case law from the Supreme Court, Tenth Circuit, or clearly established authority from any other courts, she has failed to satisfy her burden of showing that Diaz violated a "clearly established" right.

Beyond the arguments raised in her response memorandum, Plaintiff raised an additional argument, for the first time, during the hearing on the Motion (*see* ECF 67). During oral argument Plaintiff claimed that the federal rights she believes were violated by Diaz are found under the Equal Protection Clause of the United States Constitution. Even though Plaintiff failed to raise this issue in her briefing, the court finds it appropriate to consider the merits of the claim she now presents.

As already noted, the onus is on Plaintiff to demonstrate that Diaz violated a federal right and that the right allegedly violated was clearly established at the time, the failure "to carry either part of his two-part burden," would entitle Diaz to qualified immunity. *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995). While there is no doubt that the Equal Protection Clause guarantees that all citizens are entitled equal protection under the law, meaning they cannot be treated differently by the government based on their race, religion, or gender, *see* U.S. Const. amend. XIV, § 1, Plaintiff is still required to show "the existence of clearly established law that dispositively condemned the conduct at the time it occurred," *Cox v. Glanz*, 800 F.3d 1231, 1240 (10th Cir. 2015). Plaintiff is unwavering in her assertion that the challenged conduct is Diaz'

decision to use a search committee to assist him in determining which employees would be promoted. At the hearing however Plaintiff again conceded that she does not have case law from the Supreme Court, Tenth Circuit, or any other courts to support her position that Diaz' conduct violated a clearly established statutory or constitutional right. This failure is fatal to Plaintiff's argument. *Brown*, 662 F.3d at 1164 ("In order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." (quoting *Stearns*, 615 F.3d at 1282)). Even assuming that Plaintiff was pointing to some other conduct of Diaz', separate from the formation of a search committee, she has still failed to provide any clearly established law that such conduct has been "dispositively condemned." *Cox*, 800 F.3d at 1240.

It was Plaintiff's burden to establish that Diaz is not entitled to qualified immunity, and without any governing, or persuasive case law to support her position, the court is unable to discern how the undisputed facts amount to a violation of a clearly established right. In other words, Plaintiff has failed to overcome Diaz' assertion of qualified immunity. Summary judgment is therefore granted in favor of Defendants related to Plaintiff's remaining claims in her 1983 Complaint.

### C.    **Title VII Complaint**

The purpose of Title VII is "that the workplace be an environment free of discrimination, where race is not a barrier to opportunity." *Ricci v. DeStefano*, 557 U.S. 557, 580 (2009). To that end, Title VII renders it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). It is also

unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]." *Id.* § 2000e-3(a).

Plaintiff asserts claims against SLCC under Title VII for discrimination and retaliation. The court addresses each in turn.

### 1.    Discrimination

Before turning to the arguments raised in the Motion regarding Plaintiff's discrimination claims, those claims must first be identified. As alleged in the Title VII Complaint, Plaintiff's two discrimination claims relate to her not being selected for promotion back in 2019 (Title VII Complaint at 13–16). However, Plaintiff has since conceded, in her opposition to the Motion and during oral argument, that her two discrimination claims related to the promotions are barred by the relevant statute of limitations. *See Al-Ali v. Salt Lake Cmty. Coll.*, 269 F. App'x 842, 846 (10th Cir. 2008) (noting that a discrimination claim under Title VII is time-barred if not filed "within three hundred days after the alleged unlawful employment practice occurred" (quoting 42 U.S.C. § 2000e–5(e)(1))). Seeing as the parties are in agreement that those claims are time-barred, the court finds Plaintiff's claims based on her not being selected for a promotion back in 2019 time-barred and grants Defendants summary judgment.

Notwithstanding the fact that an amended complaint was never filed, it appears that Plaintiff and Defendant have litigated this matter as if Plaintiff's Title VII discrimination claims included a third claim related to the denial of her SDL request. While Defendants did object at the hearing to Plaintiff's alteration of her claims, this was the first objection Defendants raised on the matter. Defendants also agreed that for all intents and purposes they had proceeded through discovery and brought the present Motion as if Plaintiff was asserting a Title VII discrimination claim related to the denial of her SDL request. Considering the history of this litigation, and the

20

arguments raised in the Motion, the court finds it appropriate to address Plaintiff's claim based on the SDL denial.

Because Plaintiff "attempts to establish her claims through circumstantial evidence," *Walkingstick Dixon v. Oklahoma ex rel. Reg'l Univ. Sys. of Oklahoma Bd. of Regents*, No. 24-7016, 2025 WL 85495, at *6 (10th Cir. Jan. 14, 2025), the court applies the burden-shifting framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Under the *McDonnell Douglas* framework, the plaintiff has the burden of presenting a prima facie case of discrimination." *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021). "The burden then moves to the employer to articulate a legitimate, non-discriminatory reason for its actions" and "if the plaintiff cannot prove the employer's articulated reasons are pretextual" then summary judgment will be granted. *Id.* Here, the court agrees with Defendants that Plaintiff has not met her burden of establishing a prima facie case of discrimination.

To succeed in presenting a prima facie case of discrimination, Plaintiff must show that (1) she belongs to a protected class, (2) she suffered an adverse employment action, and (3) that the circumstances give rise to an inference of discrimination. *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021). There is no dispute in this matter that Plaintiff belongs to a protected class therefore the court turns to the next steps in the analysis, addressing whether Plaintiff suffered an adverse employment action and if the circumstances give rise to an inference of discrimination.

a. *Adverse Employment Action*

Here, Plaintiff alleges that the adverse employment action that she suffered was the denial of her SDL request (ECF 64 at 29). According to Plaintiff, "SDL is a benefit for all qualified SLCC

staff" and "that the denial of a benefit that is part of an employee's compensation package, can constitute an unlawful employment practice if it is done on discriminatory grounds" (*id.*). At the hearing on the Motion however, Plaintiff conceded that SDL was not a guaranteed benefit and that SLCC had discretion when it came to granting such requests. Furthermore, SLCC's SDL policy indicates that the considerations in "reviewing the applications and selecting individuals for staff development leave" include "any previous staff development leaves granted" (ECF 57-17 at 3). Thus, while Diaz may have been mistaken that the policy did not allow one employee to be granted multiple SDLs, Plaintiff's previous SDL was still a relevant factor for Diaz to consider in deciding whether to grant the second SDL. And it is undisputed that Diaz considered the fact that Plaintiff had already been granted an SDL to be highly relevant in driving his decision on whether the request should be granted. Considering the circumstances, it is difficult to see how Plaintiff's second SDL request was a guaranteed benefit that was part of SLCC's compensation package for employees. When asked if Plaintiff could provide any case law to demonstrate this may be considered adverse action, Plaintiff was unable to provide any legal authority. Moreover, Plaintiff has a particularly difficult time making this showing given that, up to that point, no other employee in the department had taken a single SDL, much less two. The court therefore declines to find the denial of the discretionary benefit constitutes an adverse action.

    b.  *Circumstances Giving Rise to an Inference of Discrimination*

    Nevertheless, even assuming that Plaintiff has shown that she suffered an adverse employment action, Plaintiff has been unable to point to any facts which would demonstrate that the denial of her SDL request occurred under circumstances that give rise to an inference of discrimination. Circumstances that may give rise to an inference of discrimination include "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus"

or "preferential treatment given to employees outside the protected class." *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005) (quoting *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)). Here, there are no actions or remarks made by any of the relevant decisionmakers that Plaintiff has presented which reflect a discriminatory animus, and there is no evidence of preferential treatment given to other employees outside of Plaintiff's protected class. The undisputed facts actually demonstrate the opposite is true, as there is no evidence that anyone other than Plaintiff has ever been granted an SDL request.

At the hearing, Plaintiff admitted that the only facts that she believed could support her position that the circumstances give rise to an inference of discrimination relate to Diaz' decision not to select Plaintiff for promotion back in 2019. Plaintiff has presented no case law or statutory support for her position that these two events, which occurred over a year apart, could demonstrate by themselves that the denial of her SDL request occurred under circumstances that give rise to an inference of discrimination. This is particularly true where Plaintiff has also not provided case law or other legal support that would demonstrate that the 2019 decision not to promote Plaintiff occurred under circumstances that give rise to an inference of discrimination. Accordingly, the court finds that Plaintiff has failed to satisfy the second prong of her prima facie discrimination case.

Ultimately, Plaintiff bears the burden of establishing her prima facie case of discrimination. *See E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000). Because Plaintiff has not met this threshold requirement on the second and third elements of her prima facie case, the court need not turn to the remaining steps set forth by the *McDonnell Douglas* framework. The court therefore grants summary judgment in favor of Defendants regarding Plaintiff's Title VII claim for discrimination.

23

2.      **Retaliation**

Finally, the court turns to Plaintiff's Title VII claims for retaliation. Similar to her discrimination claim, the claims Plaintiff asserts in response to the Motion differ from those contained in the Title VII Complaint. In the Title VII Complaint, Plaintiff indicates that her retaliation claim originated with her bringing her concerns to HR on July 21, 2021 about her SDL request and how it had been denied on or about May 14, 2021. The retaliatory act, in turn, was the MOE issued on October 21, 2021. Now, in her response to the Motion and at the hearing, Plaintiff also asserts that, in addition to the October 21 MOE, an additional retaliatory act was the MOU issued on October 15, 2021. Another alteration to Plaintiff's claims as alleged in the Title VII Complaint—which again first appeared in her response and then at the hearing—Plaintiff also asserts "that the actions of Diaz and Stirling in denying her access to SDL were directly connected to the protected activities in which [Plaintiff] had previously engaged" (ECF 64 at 34). Again, considering the history of this litigation, and arguments raised by the parties (or more accurately, the failure of Defendants to object to the discrepancies between what was alleged in the Title VII Complaint versus was what litigated), the court finds it appropriate to address all of Plaintiff's retaliation claims, even those not contained in the original Title VII Complaint.

If an individual is not asserting that there is direct evidence of retaliation—and here Plaintiff has not taken the position that her claim is based on direct evidence—they must rely on the *McDonnell Douglas* burden-shifting framework. *See* 411 U.S. at 802–04. Under this framework, if Plaintiff meets her burden to establish a prima facie retaliation claim, the burden then shifts to SLCC to "produce evidence of a legitimate, nonretaliatory reason for the adverse action." *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010). If SLCC can demonstrate that a legitimate, nonretaliatory reason exists, then "the burden of

production shifts back to [Plaintiff] to show that the proffered reason is pretextual." *Id.* But "if an employee fails to present even the limited quantum of evidence necessary to raise a prima facie inference that his or her protected activity led to an adverse employment action, it can become pointless to go through the motions of the remainder of the *McDonnell Douglas* framework to determine that unlawful retaliation was not at play." *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 n.12 (10th Cir. 2008). Based on the undisputed facts the court agrees with Defendants that Plaintiff has not met her burden of establishing a prima facie case of retaliation and there is therefore no need to consider the next steps in the *McDonnell Douglas* burden shifting analysis.

A prima facie case of retaliation requires a showing that (1) Plaintiff engaged in protected activity; (2) Plaintiff suffered a materially adverse action by SLCC either after or contemporaneous with her protected activity; and (3) a causal connection between Plaintiff's protected activity and SLCC's adverse action. *See Reinhardt*, 595 F.3d at 1131. Defendants do not dispute that when Plaintiff met with an HR representative on July 21, 2021 and discussed her concerns about discrimination that this amounted to protected activity (ECF 57 at 25–26). The court therefore focuses on the second and third prongs of Plaintiff's prima facie retaliation case, applying those to the alleged retaliatory acts identified by Plaintiff as the SDL denial and the issuance of the MOU and MOE.

    *a.  SDL Denial*

The court begins with Plaintiff's assertion "that the actions of Diaz and Stirling in denying her access to SDL were directly connected to the protected activities in which [Plaintiff] had previously engaged" (ECF 64 at 34). Even assuming that Plaintiff has shown that the denial of her SDL request constitutes an adverse action, the timing of events makes it impossible for her to establish her prima facie retaliation case. During oral argument, Plaintiff affirmed that, at the

earliest, the protected activity that Plaintiff engaged in occurred on July 21, 2021 (ECF 67), and

that Plaintiff's SDL request was denied on or about May 14, 2021 (Title VII Complaint at 7). The

second prong in a prima facie case for retaliation requires Plaintiff to show that the adverse action

occurred "either after or contemporaneous with her protected activity." *Reinhardt*, 595 F.3d at

1131. Because this alleged retaliatory act (*i.e.*, the May 14, 2021 SDL denial) occurred over two

months *before* any protected activity took place (*i.e.*, the July 21, 2021 meeting with HR), Plaintiff

has failed to establish that this adverse action occurred after or contemporaneously with her

protected activity. Consequently, Plaintiff's retaliation claim related to her SDL request being

denied fails.

### b. Issuance of the MOU and MOE

Next, the court turns to the MOU that was issued on October 15, 2021, and the MOE issued

on October 21, 2021.[8] Defendants assert that summary judgment is appropriate on these claims

because Plaintiff cannot demonstrate the third part of a prima facie case for retaliation: a causal

connection between Plaintiff's protected activities and these adverse actions. "The causal-

connection element of a prima facie retaliation claim requires the employee to show that the

employer's motive for taking adverse action was its desire to retaliate for the protected activity."

*Wells v. Colorado Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003). This element thus

necessitates that Plaintiff "show that the individual who took the adverse action against [her] knew

---

[8] The court is not convinced that these memoranda constitute adverse actions and, in particular, the October 15 MOU which stated it was "not a formal corrective action" and it would not be placed in Plaintiff's official personnel file (ECF 57-9 at 2). As the Tenth Circuit noted, "[m]ere inconveniences or alterations of job responsibilities do not constitute adverse employment actions" and "simply because an employee receives an evaluation lower than previous evaluations, the lower evaluation cannot be assumed to be a negative evaluation for the purposes of a retaliation claim." *Stover v. Martinez*, 382 F.3d 1064, 1075 (10th Cir. 2004). These memoranda accordingly appear to fall in the category of actions that would not qualify as "adverse." However, the prima facie case for retaliation requires that all elements be met, and it therefore makes no difference to the outcome of the court's ruling whether Plaintiff has failed to satisfy one or all of the requisite showings. Because the parties spent the majority of their argument on the third part of the test—addressing causal connection—the court did so as well.

of [her] protected activity." *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) (quoting *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993)). This is because "the proximity between a specific . . . activity and the alleged retaliatory act is meaningless unless those who caused the alleged retaliatory act to occur are shown to have been aware of the specific activity." *Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1184 (10th Cir. 2002).

At the hearing, Plaintiff conceded that there are no facts in the record that directly demonstrate that either Diaz or Stirling were aware of her protected activities prior to the issuance of the MOE and MOU in October 2021. Instead, Plaintiff relies on the "proximity in time" between the protected activity and the adverse actions (ECF 64 at 35). According to Plaintiff, "[t]emporal proximity between protected activity and adverse action can support a reasonable inference of causal connection, especially when the time span is as short as it is here" (*id.*). In support of this position Plaintiff cites *Clark County School District v. Breeden*, 532 U.S. 268 (2001) (per curiam). Plaintiff's reliance on *Breeden* however is misplaced. In discussing whether temporal proximity could demonstrate a causal connection between the protected activity and adverse action, the United States Supreme Court were proceeding under the assumption that there existed evidence of the "employer's knowledge of protected activity." *Id.* at 273. Indeed, the court rejected the employee's retaliation claim in *Breeden*, in part, because there was "no indication that [the employer] even knew about [the employee's protected activity] when she proposed" taking the adverse action in question. *Id.* Plaintiff has provided no case law or other legal support for her position that temporal proximity alone—absent any evidence that the employer knew that the protected activity had taken place—can suffice to demonstrate a causal between an employee's protected activity and the employer's adverse action. The requisite causal connection between Plaintiff's protected activities and any adverse actions has therefore not been demonstrated.

Plaintiff resists this conclusion by arguing that she has demonstrated a prima facie case of retaliation by showing that her protected activity was a "but-for" cause of the adverse actions (ECF 64 at 38). As previously stated however, Plaintiff admitted that her protected activity did not occur until July 21, 2021, at the earliest. Unfortunately for Plaintiff, the undisputed facts show that Stirling had been documenting various concerns she had with Plaintiff's performance well before July 2021 and had been planning on taking action related to those concerns (*see e.g.*, ECF 57-12). It is even harder for Plaintiff to argue that her protected activity was the "but-for" cause of the adverse actions when confronted with the July 14, 2021 email from Diaz, which was written a week before Plaintiff met with HR. In that email, Diaz reported that Plaintiff had "missed a couple of meetings . . . and her performance has gone down" but that "[Stirling] is working with HR to prepare a memo of expectations using the examples she has recorded" (ECF 57-8 at 4). The "adverse actions" were therefore already being contemplated and were forthcoming regardless of any actions Plaintiff was considering taking in the weeks to come. Based on the undisputed facts, the court does not find that Plaintiff has demonstrated that her protected activity was a "but-for" cause of the adverse actions or that there was a causal relationship between the two.

Because Plaintiff has not satisfied her burden of demonstrating a prima facie case of retaliation, under any of her theories for relief, summary judgment is appropriately granted in Defendants' favor on these claims.

## V.    ORDER

For the foregoing reasons, Defendants' Motion for Summary Judgement (ECF 57) is GRANTED. Plaintiff's claims in the Title VII Complaint and 1983 Complaint are DISMISSED with prejudice.

IT IS SO ORDERED.

DATED this 3 February 2025.

Magistrate Judge Cecilia M. Romero
United States District Court for the District of Utah